IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KELVIN SUTTON,** | : | CIVIL ACTION NO. 1:19-CV-2080 |
| | : | |
| **Plaintiff** | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| **DR. PAUL NOEL, DR. HARESHA PANDYA,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Kelvin Sutton ("Sutton"), an inmate who was housed at all relevant times at the State Correctional Institution at Frackville, Pennsylvania ("SCI-Frackville"), commenced this action pursuant to 42 U.S.C. § 1983 alleging that defendants failed to provide medical care for his Hepatitis C. (Doc. 1). Named as defendants are Dr. Paul Noel and Dr. Haresha Pandya. Before the court is defendant Noel's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 32). For the reasons set forth below, the court will grant in part and deny in part Noel's motion.

I.     **Factual Background & Procedural History**[1]

Hepatitis C is a viral infection that causes inflammation of the liver. See Bush v. Doe (I), ___ F. App'x ___, 2021 WL 2328347, *1 (3d Cir. June 8, 2021) (nonprecedential) (citing *Hepatitis C Fact Sheet*, WHO (July 27, 2020), https://www.who.int/news-room/factsheets/detail/hepatitis-c)). Hepatitis C may be described as acute (meaning a new infection) or chronic (meaning a long-term infection). See *Hepatitis C Information*, CDC (July 28, 2020), https://www.cdc.gov/hepatitis/hcv/index.htm. An acute infection will often lead to a chronic infection,[2] which can cause liver damage, fibrosis (scarring), cirrhosis (extreme scarring), liver cancer, or death. See id. Thus, the benefit of early treatment of

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. Id. Unless otherwise noted, the factual background herein derives from defendant Noel's Rule 56.1 statement of material facts. (Doc. 34). Sutton did not file a response to defendant Noel's statement of material facts. The court accordingly deems the facts set forth by defendant Noel to be undisputed. See LOCAL RULE OF COURT 56.1; see also Docs. 38 ¶ 3, 40 ¶ 3, 52 ¶ 3, 56 ¶ 3 (advising Sutton that failure to file a responsive statement of material facts would result in the facts set forth in defendant's statement of material facts being deemed admitted). We supplement defendant Noel's statement with certain background factual information about Hepatitis C supplied by the Third Circuit Court of Appeals' recent nonprecedential decision in Bush v. Doe (I), ___ F. App'x ___, 2021 WL 2328347, at *1 (3d Cir. June 8, 2021) (nonprecedential) (collecting information from World Health Organization ("WHO") and Centers for Disease Control and Prevention ("CDC"))).

[2] According to the CDC, more than half of people infected with the Hepatitis C virus will develop a chronic infection. See *Hepatitis C Information*, CTRS. FOR DISEASE CONTROL AND PREVENTION (July 28, 2020), https://www.cdc.gov/hepatitis/hcv/index.htm.

Hepatitis C includes the ability of the body to stave off further liver deterioration. See id.

In 2011, the Food and Drug Administration approved new direct-acting antiviral drugs ("DAADs") for treatment of Hepatitis C. Bush, 2021 WL 2328347 at *1 (citations omitted). Treatment success for Hepatitis C is defined as sustained virological response, which means the Hepatitis C virus ("HCV") is not detected in the blood for twelve or more weeks after treatment. Id. at *1 n.2. DAADs have a 90 to 95 percent success rate of producing a sustained virological response. Id. at *1 (citations omitted). As a result, in 2015, both the American Association for the Study of Liver Disease ("AASLD") and the Infectious Diseases Society of America began to recommend that all patients with chronic Hepatitis C receive DAAD treatment, "except those with limited life expectancy because of nonhepatic conditions." Id. (citations omitted). DAADs are an effective but costly treatment method. See id. (noting that DAADs "cost[] up to $100,000 per treatment").

On November 13, 2015, the Department of Corrections ("DOC") issued its Interim Hepatitis C Protocol. (Doc. 34 ¶ 8). The DOC issued updated Hepatitis C Protocols on November 7, 2016, May 9, 2018, and May 7, 2019. (Id. ¶ 11). The Protocols provide that all inmates with HCV will be entered into a chronic care clinic and periodically monitored, examined, and tested. (Id. ¶¶ 9, 12). The Protocols prioritize inmates for treatment with DAADs. (Id. ¶ 13).

Defendant Noel was the Chief of Clinical Services for the DOC from January 2014 to March 6, 2020. (Id. ¶ 14). Defendant Noel developed the DOC's Interim Hepatitis C Protocol and its three subsequent updated Hepatitis C Protocols that

provided or provide the base guideline for uniform medical treatment of all DOC inmates with HCV. (Id. ¶ 16). The DOC's Interim Hepatitis C Protocol and the subsequent Hepatitis C Protocols are all modeled after the policy of the Federal Bureau of Prisons. (Id. ¶ 17). They are prioritization protocols that address the medical needs of inmates based upon the stage of disease progression. (Id.)

Prioritization protocols are necessary because HCV is a slowly progressing disease that may take up to 40 years to develop into cirrhosis of the liver. (Id. ¶ 20). Moreover, as noted above, not all individuals with HCV will develop liver cirrhosis. (Id.) According to the DOC, it is not medically necessary to treat all inmates with HCV with DAADs at this time or in the short term. (Id. ¶ 21). Prioritization of such treatment for inmates with HCV depends on various factors including, but not limited to, liver damage shown through Aminotransferase to Platelet Ratio Index ("APRI") scores and METAVIR scores. (Id. ¶¶ 22-23, 27-29).

Chronic liver disease from HCV is measured by the degree of fibrosis. (Id. ¶ 22). The METAVIR scoring system categorizes the stages of liver fibrosis into five levels: F0 (no fibrosis); F1 (mild fibrosis); F2 (moderate fibrosis); F3 (advanced fibrosis); and F4 (cirrhosis). (Id. ¶ 23). In contrast, an APRI score is calculated on a points scale where a score greater than 2.0 may be used to predict the presence of cirrhosis (stage F4), a score between 1.5 and 2.0 may be used to predict the presence of advanced cirrhosis (stage F3), and a score of less than 1.5 may be used to predict the presence of no fibrosis, mild fibrosis, or moderate fibrosis (stages F0-F2). (See Doc. 35-4 at 3).

4

Per the Hepatitis C Protocols, the DOC monitors all inmates with chronic HCV through the chronic care clinic. (Doc. 34 ¶ 24). Monitoring includes periodic examination, testing, and review of blood test results. (Id.) The Protocols require follow-up appointments at the chronic care clinic for inmates who are diagnosed with METAVIR scores of F0 to F2 every six months, for those with METAVIR scores of F3 every three months, and for those with METAVIR scores of F4 every month. (Doc. 35-4 at 4-5). All patients diagnosed with chronic HCV are followed at the chronic care clinic, but not all are treated with DAADs. (Id. at 6-8). Instead, the Protocols require the DOC to treat the sickest inmates first, based on an inmate's METAVIR scores, as estimated by APRI scores. (Id.)

From mid-2015 through June 2019, defendant Noel reviewed referrals and determined whether inmates, with certain exceptions, were to be treated with DAADs. (Id. ¶ 26). From July 2019 through March 2020, defendant Noel reviewed referrals and determined whether inmates with an APRI score above 0.7 were to be treated with DAADs. (Id. ¶ 27). From May 2019 through June 2019, medical vendor providers at some of the prisons reviewed and determined whether inmates with an APRI score below 0.7 were to be treated with DAADs. (Id. ¶ 28). From July 2019 through March 2020, medical vendor providers at the prisons reviewed and determined whether inmates with an APRI score below 0.7 were to be treated with DAADs. (Id. ¶ 29). After each of these reviews, a Hepatitis C specialist determined which treatment regimen would be provided. (Id. ¶¶ 25-29).

Sutton contracted HCV in 2007, while incarcerated. (Doc. 1 ¶ 41). He received medical care for his HCV through the chronic care clinic which included

5

monitoring, periodic examination, testing, and review of blood test results. (Doc. 34 ¶ 30). Sutton does not have cirrhosis. (Id. ¶ 31). In May 2018, Sutton had an APRI score of 0.520 which translated to a METAVIR score of F0 to F2. (Id. ¶ 32). In December 2018, he had a lower APRI score of 0.363. (Id. ¶ 33). Sutton underwent a liver ultrasound in April 2019, which did not indicate any injury of concern. (Id. ¶ 34). In June 2019, Sutton had a lower APRI score of 0.243. (Id. ¶ 35). In November 2019, Sutton had an APRI score of 0.321. (Id. ¶ 36).

Sutton was approved for treatment with DAADs onsite at SCI-Frackville and treated with Zepatier from March 16, 2020, through June 7, 2020. (Id. ¶ 37). On September 8, 2020, Sutton received results from lab work which revealed that HCV was not detected, indicating he has been cured. (Id. ¶ 38).

Discovery has concluded and defendant Noel now moves for summary judgment. (Doc. 32). The motion is fully briefed and ripe for resolution.

## II.  **Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This

6

evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

### III. Discussion

In his motion for summary judgment, defendant Noel argues that the record lacks evidence showing that his actions rose to the level of an Eighth Amendment violation, he is entitled to qualified immunity from damages, the evidence confirms that Sutton failed to file a certificate of merit for his medical malpractice claim, and the record lacks expert testimony to establish a medical malpractice claim. (Doc. 33). The court will first consider the Eighth Amendment claim in the context of the qualified immunity defense, before turning to the medical malpractice claim.

#### A. Constitutional Claim

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials. 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must show "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

The doctrine of qualified immunity protects a state actor who has committed a constitutional violation if the plaintiff's rights were not "clearly established" when the individual acted. Pearson v. Callahan, 555 U.S. 223, 244-45 (2009). "Qualified

immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. at 231.  "Thus, so long as an official reasonably believes that his conduct complies with the law, qualified immunity will shield that official from liability." Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012) (citing Pearson, 555 U.S. at 244).  The burden to establish qualified immunity rests with the defendant claiming its protection. Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a constitutional or federal right has been violated; and (2) whether that right was "clearly established" at the time of the alleged violation. Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part by Pearson, 555 U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two Saucier prongs should be addressed first).  We will begin and end our analysis with the first prong.

For the delay or denial of medical care to rise to an Eighth Amendment violation, a prisoner must demonstrate: "(1) that defendants were deliberately indifferent to [his] medical needs and (2) that those needs were serious." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).  Deliberate indifference requires proof that the official "knows of and disregards an excessive risk to inmate health or safety." Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).  Deliberate indifference has been found where a prison official: "(1) knows of a prisoner's need for medical

treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a nonmedical reason; or (3) prevents a prisoner from receiving needed or recommended treatment." Rouse, 182 F.3d at 197. Deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment. . . (which) remains a question of sound professional judgment." Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (quoting Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)). "Allegations of medical malpractice are not sufficient to establish a Constitutional violation," nor is "[m]ere disagreement as to the proper medical treatment." Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004). A "failure to provide adequate care . . . [that] was deliberate, and motivated by non-medical factors" is actionable under the Eighth Amendment, but "inadequate care [that] was a result of an error in medical judgment" is not. Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993); see also Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

There is no dispute that Sutton's Hepatitis C qualifies as a serious medical condition for purposes of the Eighth Amendment analysis. Moore v. Luffey, 767 F. App'x 335, 340 (3d Cir. 2019) (nonprecedential) (recognizing Hepatitis C constitutes a serious medical need). However, Sutton has not advanced sufficient evidence to permit the trier of fact to determine that defendant Noel acted with deliberate indifference to his serious medical needs.

The record reflects that there is an orderly progression that is required before treatment for Hepatitis C and, pursuant to that prioritization protocol, no

9

inmate is absolutely precluded from receiving Hepatitis C treatment.  (Doc. 34 ¶¶ 9-10, 12-13, 17).  There is no genuine dispute that defendant Noel followed the DOC's Hepatitis C Protocols in treating Sutton's HCV.

While Sutton asserts that defendant Noel failed to provide medical care for his Hepatitis C, the record is replete with evidence that he in fact received regular medical care for this condition, as provided for by the DOC's treatment Protocols. The uncontroverted record evidence establishes that Sutton was stable, was being monitored and treated in accordance with the Protocols, received blood tests and liver screenings—which indicated that his liver was in good condition, and was ultimately cured.  (Docs. 35-5, 35-6, 35-7, 35-8).  Specifically, the record before the court evinces that from May 2018 through November 2019, Sutton had low APRI scores—ranging from 0.243 to 0.520—and was not a candidate for treatment with DAADs under the DOC's Protocols for treating Hepatitis C.  (Doc. 34 ¶¶ 32-36).  An ultrasound of the liver in April 2019, prior to treatment with DAADs, did not indicate any injury of concern.  (Id. ¶ 34).  During this time when Sutton's condition did not warrant treatment with DAADs, he received medical care through the chronic care clinic which included monitoring, periodic examination, testing, and review of blood test results.  (Id. ¶ 30; Doc. 35-5).  Beginning in March 2020, Sutton was approved for treatment with DAADs and was treated with Zepatier.  (Doc. 34 ¶ 37; Doc. 35-7).  Sutton's condition never progressed to cirrhosis.  (Doc. 34 ¶ 31). Labwork from September 2020 revealed that HCV was not detected, indicating that Sutton has been cured.  (Id. ¶ 38; Doc. 35-6 at 31-33).  On these unconverted facts, no

reasonable jury could conclude that defendant Noel failed to provide medical care and treatment for Sutton's Hepatitis C.

Sutton's primary complaint is that his treatment should have begun earlier, based on a declaration from the AASLD that treatment with DAADS is recommended for all patients with chronic Hepatitis C "irrespective of disease stage." (Doc. 59 at 2; see also Doc. 1 at 15). This argument implies Sutton's disagreement with a particular course of treatment. Critically, however, mere disagreement with the selected course of treatment is not grounds for a medical deliberate indifference claim. See Thomas v. Dragovich, 142 F. App'x 33, 36 (3d Cir. 2005) (nonprecedential) (citing Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987)). To the extent that Sutton asserts that defendant Noel's professional judgment was deficient (see Doc. 59 at 3), this also is not enough to rise to the level of a constitutional violation, and courts will not second guess whether a particular course of treatment is adequate or proper. See Parham v. Johnson, 126 F.3d 454, 458 n.7 (3d Cir. 1997) (citing Inmates of Allegheny Cnty. Jail, 612 F.2d at 762).

Sutton further asserts that the delay in treatment caused eczema, depression, fatigue, and abdominal pain. (Doc. 59 at 3; see also Doc. 1 at 21). In May 2018, Sutton was treated in the chronic care clinic and it was noted he had a skin rash likely caused by his gout medication. (Doc. 35-5 at 4-6). Additional documentation provides that Sutton's contact dermatitis was caused by an irritant. (Doc. 59-1 at 21, 23, 24, 26, 28, 31). In June 2019 and November 2019, Sutton presented to the chronic care clinic with reports of fatigue and intermittent abdominal pain, which

11

could be symptoms of liver disease.  (Doc. 35-5 at 14, 19).  Upon assessment, Sutton's liver disease control was determined to be good (F0-F2 or APRI of less than 1.5), his liver disease status remained unchanged, and he had no abdominal pain on examination.  (Id. at 16, 23-24).  Shortly thereafter, in January 2020, labwork revealed that Sutton's viral load increased, and he began treatment with DAADs in March of 2020, which was completed by June 2020.  Sutton has not adduced any evidence that his treatment was delayed for nonmedical reasons or that he suffers from long-term ailments as a result of any delayed treatment for his Hepatitis C.  See Altenbach v. Ianuzzi, 646 F. App'x 147, 152 (3d Cir. 2016) (nonprecedential) (requiring inmate to submit "'verif[ied] medical evidence . . . to establish the detrimental effect of [the] delay' [in medical treatment] as he must do to support a delayed treatment claim") (citing Hill v. Dekalb Rg'l Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994)).  In fact, quite the contrary, as Sutton has been effectively cured.

Given the well-documented course of treatment set forth in the record, Sutton has failed to show that issues of material fact exist as to whether defendant Noel was deliberately indifferent to his serious medical needs.  As a factual matter, it is undisputed that Sutton's medical treatment commenced immediately upon entering SCI-Frackville, he received various forms of treatment for his Hepatitis C, and he was carefully monitored by prison medical staff in accordance with the Protocols.  The Third Circuit has upheld the constitutionality of medical choices relating to the care and treatment of Hepatitis C and has rejected inmate Eighth Amendment challenges to this type of medical care.  See, e.g., Moore, 767 F. App'x

12

335 (affirming summary judgment on inmate's Eighth Amendment claim relating to treatment of Hepatitis C and finding doctor appropriately monitored and treated inmate in accordance with policy); Lasko v. Watts, 373 F. App'x 196, 203 (3d Cir. 2010) (nonprecedential) (affirming summary judgment on inmate's Eighth Amendment claim relating to treatment of Hepatitis C); Hodge v. U.S. Dep't of Justice, 372 F. App'x 264 (3d Cir. 2010) (nonprecedential) (same).  Because Sutton failed to establish an Eighth Amendment violation as to defendant Noel, he is entitled to qualified immunity.

**B.     Medical Malpractice Claim**

Defendant Noel next seeks summary judgment on Sutton's medical malpractice claim based on his failure to comply with Pennsylvania's certificate of merit (requirements and failure to provide expert testimony.  (Doc. 33 at 13-15). Pennsylvania Rule of Civil Procedure 1042.3 requires a plaintiff alleging professional negligence to file a certificate of merit within 60 days of filing the complaint.  PA. R. CIV. P. 1042.3.  The certificate must include one of the following: a written attestation by "an appropriate licensed professional" that there is a "reasonable probability that the care, skill or knowledge exercised or exhibited" by the defendant "fell below acceptable professional standards," and that this was the cause of the plaintiff's injuries; a statement that the claim against the defendant is based only on the professional negligence of those for whom the defendant is responsible; or a statement that expert testimony is unnecessary for the plaintiff's claim to proceed.  PA. R. CIV. P. 1042.3(a)(1)-(3).  Failure to file a certificate of merit is fatal to a plaintiff's claim.  PA. R. CIV. P. 1042.7.  A defendant seeking to dismiss

13

for want of a certificate must first file written notice of their intent to do so, no sooner than 30 days after the complaint was filed. PA. R. CIV. P. 1042.6(a), 1042.7.

There is no indication that counsel for defendant Noel mailed Sutton a notice of intent to dismiss pursuant to Pennsylvania Rule of Civil Procedure 1042.7. Because defendant Noel failed to attach proof that he served notice of his intent to dismiss for failure to file a certificate of merit upon Sutton, we must deny the motion on this ground without prejudice.[3] See Schmigel v. Uchal, 800 F.3d 113, 123 (3d Cir. 2015) (holding that "the condition of thirty days' notice prior to seeking dismissal of an action for failure to comply with the COM regime is substantive and must be applied in federal court").

## IV.  Conclusion

Defendant Noel's motion (Doc. 32) for summary judgment will be granted in part and denied in part without prejudice. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER<br>
Christopher C. Conner<br>
United States District Judge<br>
Middle District of Pennsylvania

Dated:     October 19, 2021

---

[3] Pennsylvania Rule of Civil Procedure 1042.6(b) provides that a judgment of *non pros* for failure to file a certificate of merit may be entered without notice if "(1) the court has granted a motion to extend the time to file the certificate and the plaintiff has failed to file it within the extended time, or (2) the court has denied the motion to extend the time." PA. R. CIV. P. 1042.6(b). Neither circumstance applies here.