**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KELVIN SUTTON,** | : | **CIVIL ACTION NO. 1:19-CV-2080** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **DR. PAUL NOEL, DR. HARESHA** | : | |
| **PANDYA,** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Plaintiff Kelvin Sutton ("Sutton"), an inmate who was housed at all relevant times at the State Correctional Institution at Frackville, Pennsylvania ("SCI-Frackville"), commenced this action pursuant to 42 U.S.C. § 1983 alleging that defendants failed to provide medical care for his Hepatitis C. (Doc. 1). Named as defendants are Dr. Paul Noel and Dr. Haresha Pandya. Before the court is defendant Pandya's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 63). For the reasons set forth below, the court will grant the motion.

## I.    Factual Background & Procedural History[1]

Hepatitis C is a viral infection that causes inflammation of the liver.  See

Bush v. Doe (I), 858 F. App'x 520, 521 (3d Cir. June 8, 2021) (nonprecedential) (citing

*Hepatitis C Fact Sheet*, World Health Organization (July 27, 2020),

https://www.who.int/news-room/factsheets/detail/hepatitis-c)).[2]  Hepatitis C may be

described as acute (meaning a new infection) or chronic (meaning a long-term

infection).  See *Hepatitis C Information*, Centers for Disease Control (July 28, 2020),

https://www.cdc.gov/hepatitis/hcv/index.htm.  An acute infection will often lead to a

---

[1]  Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from defendant Pandya's Rule 56.1 statement of material facts.  (Doc. 64).  Sutton did not file a response to defendant Pandya's statement of material facts.  The court accordingly deems the facts set forth by defendant Pandya to be undisputed.  See LOCAL RULE OF COURT 56.1; see also Doc. 69 ¶ 3 (advising Sutton that failure to file a responsive statement of material facts would result in the facts set forth in defendant Pandya's statement of material facts being deemed admitted).  We supplement defendant Pandya's statement with certain background factual information about Hepatitis C supplied by the Third Circuit Court of Appeals' nonprecedential decision in Bush v. Doe (I), 858 F. App'x 520, 521 (3d Cir. June 8, 2021) (nonprecedential) (collecting information from World Health Organization ("WHO") and Centers for Disease Control and Prevention ("CDC"))).

[2]  The court acknowledges that nonprecedential decisions are not binding upon federal district courts.  Citations to nonprecedential decisions reflect that the court has carefully considered and is persuaded by the panel's *ratio decidendi*.

chronic infection,[3] which can cause liver damage, fibrosis (scarring), cirrhosis (extreme scarring), liver cancer, or death.  Id.  Thus, the benefit of early treatment of Hepatitis C includes the ability of the body to stave off further liver deterioration. Id.

In 2011, the Food and Drug Administration approved new direct-acting antiviral drugs ("DAADs") for treatment of Hepatitis C.  Bush, 858 F. App'x at 521 (citations omitted).  Treatment success for Hepatitis C is defined as sustained virological response, which means the Hepatitis C virus ("HCV") is not detected in the blood for twelve or more weeks after treatment.  Id. at 521 n.2.  DAADs have a 90 to 95 percent success rate of producing a sustained virological response.  Id. at 521 (citations omitted).  As a result, in 2015, both the American Association for the Study of Liver Disease ("AASLD") and the Infectious Diseases Society of America began to recommend that all patients with chronic Hepatitis C receive DAAD treatment, "except those with limited life expectancy because of nonhepatic conditions." Id. (citations omitted).  DAADs are an effective but costly treatment method.  See id. (noting that DAADs "cost[] up to $100,000 per treatment").

Sutton alleges that he contracted Hepatitis C in 2007, while incarcerated, and that defendant Pandya failed to provide adequate medical treatment.  (Doc. 64 ¶¶ 2-3).  Specifically, Sutton alleges that he has not received any medical treatment for

---

[3]  According to the CDC, more than half of the people infected with the Hepatitis C virus will develop a chronic infection.  See Hepatitis C Information, CTRS. FOR DISEASE CONTROL AND PREVENTION (July 28, 2020), https://www.cdc.gov/hepatitis/hcv/index.htm.

his Hepatitis C and has been denied medical treatment pursuant to the Pennsylvania Department of Corrections' ("DOC") Hepatitis C Protocol, despite having a high viral load and consistent, diminished low platelet counts. (Id. ¶ 3). During the relevant time period, defendant Pandya was employed by the medical contractor for the DOC to provide medical services to inmates. (Id. ¶ 4). Defendant Pandya has submitted an extensive summary of the medical care Sutton received while incarcerated. (Id. ¶¶ 5-6). The undisputed material facts of Sutton's care and treatment are set forth in detail below. This detailed factual recitation reflects that Sutton received over seven years of extensive medical treatment for a variety of ailments including but not limited to Hepatitis C.

On January 7, 2014, Sutton was treated by certified registered nurse practitioner ("CRNP") Chris Collins for renewal of medications, including Allopurinol, Naproxen, and Vitamin D ointment. (Id. ¶ 7).

On February 21, 2014, CRNP Nelson Iannuzzi treated Sutton regarding complaints about his orthopedic boots. (Id. ¶ 7). Thereafter, on March 3, 2014, Sutton was seen by CRNP Iannuzzi for a follow-up regarding his boots, and otherwise had no medical issues. (Id. ¶ 9). On March 14, 2014, at SCI-Mahanoy, Sutton was seen by CRNP Collins. (Id. ¶ 10). At that time, he requested gel insoles for his shoes and complained of sinus congestion. (Id. ¶ 11). CRNP Collins examined Sutton and prescribed a nasal spray and ordered a new pair of gel insoles. (Id. ¶ 10). On March 31, 2014, Sutton received his antihistamine prescription and gel insoles. (Id. ¶ 11).

4

On April 23, 2014, Sutton was transferred to SCI-Frackville.  (<u>Id.</u> ¶ 13).  On May 5, 2014, Dr. Adrian Harewood treated Sutton for complaints of nasal stiffness, prescribed an antihistamine, and ordered that Sutton be seen in the foot clinic.  (<u>Id.</u> ¶ 14).

On May 15, 2014, Sutton was evaluated in the Hepatitis C Clinic.  (<u>Id.</u> ¶ 15). Upon presentation, he did not have any complaints.  (<u>Id.</u>)  With respect to his Hepatitis C, his August 20, 2013 lab results revealed that his white blood count ("WBC") was 3.65, hemoglobin was 14.5, hematocrit ("HCT") count was 50.1, absolute neutrophil count ("ANC") was 1.12, platelet level was 16, bilirubin was 0.4, AST was 48, alkaline phosphate level was 57, BUN/CR count was 11/1.00, and his viral load was recorded as 5,175,830.  (<u>Id.</u>)  Also on May 15, 2014, Dr. Harewood ordered Sutton to have a comprehensive metabolic pane ("CMP") and complete blood work ("CBC") performed every four (4) months and a prothrombin time test with an international normalized ratio ("PT/INR") performed every twelve (12) months beginning in April of 2015.  (<u>Id.</u> ¶ 16).  He also ordered testing for Hepatitis A and HIV testing.  (<u>Id.</u>)

On May 16, 2014, Sutton was seen by Dr. Harewood for complaints of right shoulder numbness.  (<u>Id.</u> ¶ 17).  There was no radiation or weakness.  (<u>Id.</u>)  Dr. Harewood's impression was shoulder paresthesia and he instructed Sutton to alter his sleeping position at night and directed him to be return for follow-up care as needed.  (<u>Id.</u>)

On June 3, 2014, lab results revealed that Sutton tested positive for Hepatitis A antibodies, Hepatitis B Core antibodies, and Hepatitis C antibodies.  (Id. ¶ 18)

On June 10, 2014, Sutton was seen by Dr. Harewood for complains of right shoulder pain and numbness.  (Id. ¶ 19).  Dr. Harewood's assessment was shoulder pain likely due to arthritis.  (Id.)  He instructed Sutton to continue using his Naproxen and ordered an X-ray of Sutton's right shoulder.  (Id.)  On June 13, 2014, the X-ray of Sutton's right shoulder was performed which revealed mild degenerative joint disease of the right shoulder with no visible fractures or dislocations.  (Id. ¶ 20).  Dr. Harewood also ordered that Sutton's orthotics be reissued.  (Id. ¶ 21).

On June 17, 2014, Sutton reviewed his medical records.  (Id. ¶ 22).

On June 20, 2014, Dr. Harewood treated Sutton for complaints of a runny nose.  (Id. ¶ 23).  He instructed Sutton to purchase nasal spray from the commissary and to return to medical as needed.  (Id.)

On July 2, 2014, Sutton was a no show for education on diabetes with nursing.  (Id. ¶ 24).

On July 11, 2014, Sutton was advised that his HIV results were negative.  (Id. ¶ 25).

Sutton failed to show for his requested records review appointment on August 20, 2014.  (Id. ¶ 26).  However, he subsequently reviewed his records on September 4, 2014.  (Id.)

On September 19, 2014, Dr. Pandya directed that Sutton be given two (2) pairs of orthopedic insoles for the year and a pair of orthopedic shoes for the new soles.  (Id. ¶ 27).

On October 7, 2014, Sutton had lab work drawn which indicated that he had an absolute neutrophil count of 1.25, a MPV count of 11.2, a neutrophils count of 29.4, and a lymphocyte count of 61.1.  (Id. ¶ 28).

On November 23, 2014, Sutton received his orthopedic shoes from Dr. Pandya.  (Id. ¶ 29).  Dr. Pandya also clipped his nails and entered an order that Sutton have his nails trimmed every three (3) months.  (Id.)

Sutton reviewed his medical records on December 4, 2014.  (Id. ¶ 30).

On January 7, 2015, CRNP Iannuzzi trimmed Sutton's nails at the foot clinic.  (Id. ¶ 31).

On March 21, 2015, Sutton was seen by nurse Wilson in triage for complaints of sciatic pain.  (Id. ¶ 32).  It was noted that Sutton walked to medical without difficulty.  (Id.)  He reported that he had pain in his thigh and down his leg.  (Id.)  Sutton was assessed for alteration in comfort, given an ice pack and Tylenol, and referred to sick call.  (Id.)

On March 23, 2015, Dr. Pandya saw Sutton on sick call for ongoing sciatic pain.  (Id. ¶ 33).  Dr. Pandya examined Sutton and instructed him to exercise, massage the affected areas during showers, prescribed Vitamin D, and scheduled an appointment with the foot clinic.  (Id.)

On April 1, 2015, Sutton was treated by CRNP Iannuzzi at the foot clinic.  (Id. ¶ 34).  During the appointment, his nails were trimmed.  (Id.)  CRNP Iannuzzi discontinued Sutton's foot clinic scheduled for every three (3) months and noted that Sutton would place a request when his nails needed to be trimmed.  (Id.)

On April 2, 2015, CRNP Iannuzzi conducted a chart review to check Sutton's overall care orders.  (Id. ¶ 35).  He noted that Sutton's last optometry appointment was in 2011; therefore, he made an optometry referral.  (Id.)

Sutton had lab work done on April 7, 2015, which revealed that he had a neutrophil count of 34.9, lymphocyte level of 54, and a MPV level of 11.3.  (Id. ¶ 36).

On May 14, 2015, Dr. Pandya evaluated Sutton at the Hepatitis C Chronic Clinic and noted that Sutton's PT/INR was 1.02/10.7, his AST level was 23, and his ALT level was 17.  (Id. ¶ 37).  It was also noted that he was at his goal with respect to his Hepatitis C.  (Id.)  Also on May 14, 2015, nursing met with Sutton to educate him on the occult blood test for stool samples and provided him the specimen cards to submit his stool sample.  (Id. ¶ 38).  Thereafter, Sutton refused rectal and genital exams and hemoccult testing to be performed by Dr. Pandya.  (Id.)  On May 20, 2015, Sutton submitted his stool samples for his occult blood tests.  (Id.)

On May 15, 2015, Sutton received a Hepatitis C Screening and Evaluation.  (Id. ¶ 39).  It was noted that he previously tested positive for Hepatitis A antibodies on June 3, 2014.  (Id.)  Sutton's August 20, 2013 lab results were listed as follows:  BUN: 111, Creatinine: 1.00, Alkaline Phosphate: 57, ALT: 45, AST 48, Bilirubin: 0.4, and HCV viral load: 26,914,318.  (Id. ¶ 39).  It was also noted that he previously

refused treatment on February 12, 2011.  (Id.)  Thereafter, Sutton executed a "Release from Responsibility for Medical Treatment" confirming that he refused Hepatitis C treatment on May 15, 2015.  (Id.).

Following Sutton's May 14, 2015 physical examination, Dr. Pandya completed a Physician's Order form, indicating that Sutton wore glasses.  (Id. ¶ 40).  He also completed a Chronic Clinic Physician's Orders form directing Sutton to be scheduled for CMP and CBC panels and a PT/INR lab.  (Id.)  On June 11, 2015, Sutton received new glasses.  (Id. ¶ 41).

On August 26, 2015, Sutton was a no show at the foot clinic.  (Id. ¶ 42).

On September 8, 2015, Sutton was sent to the emergency room at an outside hospital after he suffered a laceration to his left upper lip from an altercation with another inmate.  (Id. ¶ 43).  Nurse Kathleen Shorts noted that he returned to the prison the same day and had two dissolvable sutures.  (Id.)  Sutton complained of pain, and the nurse noted his vitals and reviewed the hospital's wound care instructions with him.  (Id.)  He was put on sick call for the following day.  (Id.)

On September 9, 2015, CRNP Iannuzzi treated Sutton on sick call noting he said: "I'm okay, I didn't ask for sick call, I don't need sick call."  (Id. ¶ 43).  CRNP Iannuzzi observed that Sutton had no significant swelling or bleeding, a small laceration on his left upper eyelid, patchy ecchymosis, and that he deferred sick call and was seen at his RHU cell door.  (Id.)

On September 15, 2015, Dr. Pandya treated Sutton for complaints of a headache and dizziness when he shakes his head.  (Id. ¶ 45).  Dr. Pandya assessed

9

him for a post H1 headache and mild vertigo and offered meclizine.  (Id.)  Sutton expressed that he wanted to make lifestyle changes, including changes to his diet. (Id.)  Dr. Pandya educated Sutton on lifestyle changes and instructed him to return in one (1) month.  (Id.)

On October 4, 2015, Sutton presented to medical with complaints of vomiting due to food.  (Id. ¶ 46).  Upon examination, his vitals were normal, he denied additional symptoms, and he was advised to return if the symptoms worsened.  (Id.)

Sutton had a lab work taken on October 13, 2015, which revealed that his absolute neutrophil count was 1.21, his neutrophil count was 27.9, lymphocyte count was 53.8, and his alkaline phosphate level was 51.  (Id. ¶ 47).  Sutton reviewed his medical records on October 13, 2015. (Id. ¶ 48).

On October 16, 2015, Dr. Pandya treated Sutton for foot pain, examined him, ordered uric acid testing for gout, and prescribed analgesics.  (Id. ¶ 49).

On October 28, 2015, CRNP Iannuzzi clipped Sutton's nails at the foot clinic. (Id. ¶ 50).  Also on October 28, 2015, Dr. Pandya treated Sutton for issues with his orthotic shoes.  (Id. ¶ 51).  Upon examination, Dr. Pandya found that Sutton's shoes had minimal separation, which was usual wear-and-tear.  (Id.)  Dr. Pandya subsequently assessed Sutton for plantar fasciitis, moderate degenerative joint disease of the first metatarsal bone, backache, and a history of gout.  (Id.)  The plan was to continue his current orthotic shoes.  (Id.)

On November 2, 2015, Dr. Pandya conducted a chart review to review Sutton's history involving gout and orthotics.  (Id. ¶ 52).

On November 9, 2015, a nurse noted receipt of Sutton's shoes for repair.  (Id. ¶ 53).

On November 20, 2015, Sutton presented to Dr. Pandya with complaints of needing a bottom bunk because of pain while exiting the top bunk.  (Id. ¶ 54).  Dr. Pandya issued Sutton a medical restriction to bottom bunk status for approximately one (1) year, noting he had a diagnosis of plantar fasciitis.  (Id.)

On March 9, 2016, CRNP Iannuzzi trimmed Sutton's nails without incident at the foot clinic.  (Id. ¶ 55).

On April 12, 2016, Sutton had lab work done and was positive for HCV RNA Qual, had a HCV RNA, Quantitative count of 3,675,487, and a LOG HCV of 6.57.  (Id. ¶ 56).

On April 14, 2016, Sutton was seen by a nurse to have the screws in his glasses tightened.  (Id. ¶ 57).

Sutton reviewed his medical records on April 20, 2016.  (Id. ¶ 58).

On May 5, 2016, Dr. Pandya treated Sutton for a routine physical and for Hepatitis C Chronic Care Clinic.  (Id. ¶ 59).  Dr. Pandya noted that Sutton was previously tested for Hepatitis A and B.  (Id.)  He also noted that April 12, 2016 lab work revealed that Sutton's bilirubin count was greater than 1, his Albumin count was 4.3, his MELD score was 4, and he had a viral load of 3,675,487.  (Id.)  Sutton's Hepatitis C was stable, he was at his goal, and his next Hepatitis C clinic would occur in twelve (12) months.  (Id.)  Following Sutton's May 5, 2016 physical examination, Dr. Pandya ordered that Sutton be scheduled for CMP and CBC labs

every six (6) months and a PT/INR lab every twelve (12) months. (<u>Id.</u> ¶ 60). Both sets of labs were ordered to assess Sutton's liver condition. (<u>Id.</u>) Dr. Pandya further instructed that Sutton be scheduled for a follow-up appointment in twelve (12) months and ordered him a pair of eyeglasses. (<u>Id.</u>)

On May 8, 2016, nursing provided Sutton with the materials for his routine occult blood stool testing and explained how to obtain and return the specimen to medical. (<u>Id.</u> ¶ 61).

On June 2, 2016, CRNP Iannuzzi trimmed Sutton's toenails at the foot clinic. (<u>Id.</u> ¶ 62).

On August 31, 2016, Sutton was a no show for sick call and reported that he did not require any treatment. (<u>Id.</u> ¶ 63).

On September 14, 2016, Sutton's nails were trimmed at the foot clinic. (<u>Id.</u> ¶ 64).

On September 21, 2016, lab work indicated that Sutton's alkaline phosphate level was 47 and his glucose level was 125. (<u>Id.</u> ¶ 65).

On October 27, 2016, Sutton created an individual recovery plan ("IRP") with psychology which provided that his goal was to gain a clear understanding of how to function and deal with the reality of life and stay out of a downward mental state. (<u>Id.</u> ¶ 66). Sutton identified several areas of concern, including substance use and abuse. (<u>Id.</u>)

Sutton was a no show for the foot clinic on November 9, 2016. (<u>Id.</u> ¶ 67).

On November 21, 2016, Dr. Pandya treated Sutton and determined that his shoes were minimally worn out and entered an order for new orthotic shoes.  (Id. ¶ 68).

On December 9, 2016, CRNP Iannuzzi treated Sutton for complaints of occasional low back pain.  (Id. ¶ 69).  Sutton had no other symptoms or complaints. (Id.)

Sutton reviewed his medical records on December 20, 2016.  (Id. ¶ 70).

On December 28, 2016, nurse Shelbi treated Sutton to discuss his Hepatitis C. (Id. ¶ 71).  Sutton asked if he had fibrosis or cirrhosis.  (Id.)  He explained that he recently told his family that he was diagnosed with Hepatitis C and his family had many questions.  (Id.)  Nurse Shelbi explained that he could not infect another person by hugging or kissing them, but he should cover open lesions with a Band-Aid.  (Id.)  She also advised Sutton that the central office determined who were candidates for treatment.  (Id.)  Sutton stated that he understood, and he also stated that he recalled refusing treatment for his Hepatitis C treatment because a lot of people reported sickness during treatment. (Id.)  Nurse Shelbi instructed Sutton to return for treatment if he had any additional questions and she would schedule him for another medical conference.  (Id.)

On December 29, 2016, Sutton reported to Dr. Pandya that the treading on his shoes was worn out and that he fractured his fifth metatarsal bone in the past. (Id. ¶ 72).  Dr. Pandya reviewed Sutton's 2013 X-ray which showed that Sutton had degenerative joint disease in the first metatarsal bones on his right and left feet.

13

(<u>Id.</u>)  Dr. Pandya also noted that Sutton had Timberland boots.  (<u>Id.</u>)  He assessed Sutton for plantar fasciitis, noted that the insole in his shoe was worn, and ordered diabetic shoes, lab work, and a follow-up visit.  (<u>Id.</u>)

On January 4, 2017, CRNP Iannuzzi cut Sutton's toenails in the foot clinic.  (<u>Id.</u> ¶ 73).

On January 18, 2017, Sutton reviewed his medical records pertaining to consultations and feet issues.  (<u>Id.</u> ¶ 74).

On January 24, 2017, lab work indicated that Sutton's CMP and hemoglobin AIC panels were normal.  (<u>Id.</u> ¶ 75).

On January 31, 2017, Dr. Pandya treated Sutton for complaints regarding his feet and ordered a trial pair of diabetic shoes.  (<u>Id.</u> ¶ 76).  On February 15, 2017, Dr. Pandya treated Sutton and noted that he refused to sign the form accepting his diabetic shoes.  (<u>Id.</u> ¶ 77).  Sutton stated that he disagreed with using diabetic shoes because they did not have arch support and that signing the form would suggest that he agreed with the recommendation.  (<u>Id.</u>)  Dr. Pandya also discussed Sutton's blood work related to gout and recommended that he take an increased dose of anti-gout medication.  (<u>Id.</u>)  Dr. Pandya gave Sutton the diabetic shoes, even though he would not sign the form to receive them.  (<u>Id.</u>)

On February 28, 2017, Sutton was a no show for sick call and, instead, went to the yard.  (<u>Id.</u> ¶ 78).

On March 1, 2017, lab work revealed that Sutton's albumin level was 4.5, total bilirubin was 0.7, creatinine level was 0.98, SGOT/AST level was 24, SCPT/ALT was 17, and his INR was 1.02.  (Id. ¶ 79).

On March 7, 2017, Sutton was a no show for sick call with CRNP Iannuzzi. (Id. ¶ 80).

On March 10, 2017, CRNP Iannuzzi treated Sutton for complaints of intermittent back pain and intermittent pain on the bottom of his feet approximately once a week.  (Id. ¶ 81).  CRNP Iannuzzi examined Sutton and noted degenerative joint disease and osteoarthritis.  (Id.)  He gave Sutton a handout illustrating stretches for his low back pain and educated him on stretching.  (Id.) Sutton's blood pressure was 140/90 and CRNP Iannuzzi wanted it checked again later that day.  (Id.)

Sutton reviewed his medical records on March 22, 2017.  (Id. ¶ 82).

On April 26, 2017, CRNP Iannuzzi clipped Sutton's nails at the foot clinic. (Id. ¶ 83).

Dr. Pandya treated Sutton in the Hepatitis C Chronic Care Clinic on May 4, 2017.  (Id. ¶ 84).  Dr. Pandya assessed Sutton for Hepatitis C, and noted he was hyperuricemic and had degenerative joint disease in his ankle, hip, and shoulder. (Id.)  Dr. Pandya prescribed a multivitamin, exercises to treat the degenerative joint disease, and Naprosyn.  (Id.)  He noted that Sutton wore the diabetic shoes, but stated they hurt his feet and that he needed arch support.  (Id.)  Dr. Pandya ordered lab work and scheduled Sutton for an annual preventative care screening, a

Hepatitis C Chronic Care Clinic, lipid profiles every five (5) years, hemoglobin AlC every three (3) years, and hemoccult testing.  (Id. ¶ 85).  Dr. Pandya screened Sutton for Hepatitis B and C and HIV, and recorded that Sutton received several immunizations, including one dose of the tetanus, diphtheria & acellular pertussis ("Tdap") vaccine, the flu vaccine, a second dose of the Hepatitis A vaccine, and a third dose of the Hepatitis B vaccine.  (Id.)

On May 15, 2017, Sutton was seen by psychology.  (Id. ¶ 86).  Sutton denied being suicidal, stated he was cooperative but then refused to be seen.  (Id.)

On June 7, 2017, Sutton was seen by psychology after receiving a misconduct. (Id. ¶ 87).  An individual recovery plan was created with goals to have a better outlook, work on his depression, increase his medical compliance, and recognize what he cannot control.  (Id.)

On July 12, 2017, Sutton was seen by CRNP Iannuzzi at the foot clinic with complaints that his shoes may be too big.  (Id. ¶ 88).  CRNP Iannuzzi assessed him for thick nails and a shoe fit and clipped his nails.  (Id.)

On October 9, 2017, Dr. Pandya treated Sutton for a rash on his left hand, he noted a lesion at the 4th web left hand, and his assessment was eczema.  (Id. ¶ 89). Dr. Pandya prescribed an antifungal and planned to reevaluate Sutton the following month during chronic care clinic.  (Id.)

On October 27, 2017, CRNP Iannuzzi treated Sutton for contact dermatitis, tinea cruris, and overworking.  (Id. ¶ 90).

On November 1, 2017, Sutton was a no show at the foot clinic.  (Id. ¶ 91).

On November 2, 2017, Dr. Pandya treated Sutton at the Hepatitis C Chronic Care Clinic and assessed Sutton for Hepatitis C and a small pustule on his leg. (Id. ¶ 92). As of September 27, 2017, Sutton's APRI Score was 0.385, MELD score was 7, CTP score was 5, and his viral load was 3,675,487. (Id.) Dr. Pandya prescribed clindamycin for Sutton's leg and recommended follow-up care. (Id.) He also ordered several panels and clinical testing for Sutton before the March 2018 Hepatitis C Chronic Care Clinic. (Id.) Dr. Pandya instructed Sutton to return to Chronic Care Clinic for his liver FO-F2 every six (6) months and to present to the MD Line on November 9, 2017. (Id.)

On November 15, 2017, Dr. Pandya treated Sutton and noted that the thrush lesions dried up. (Id. ¶ 94). His assessment was multiple folliculitis—improved, and eczema. (Id.) Dr. Pandya prescribed a cream and noted that he would be seen again at the chronic care clinic. (Id.)

On November 22, 2017, Sutton worked with psychology to create an individual recovery plan to work with his depression and agitation. (Id. ¶ 95). Sutton identified the following as areas of concern: anxiety/panic, depressed mood/sadness, substances use/abuse, withdrawn/reclusive, negative self-talk/low self-esteem, and his incarceration. (Id.) The plan was for Sutton to be seen by psychology monthly, or to be seen on an as needed basis. (Id.)

On November 24, 2017, Sutton was seen by Dr. Pandya on the MD Line. (Id. ¶ 96). Sutton reported that his leg and thigh had healed, but he had eczema on his right hand. (Id.) Dr. Pandya educated Sutton on his condition, prescribed an

17

antibiotic ointment and a cream, and noted that he would follow-up in a few weeks. (Id.)

On December 4, 2017, CRNP Iannuzzi treated Sutton for occasional aches and pains in his feet and lower back, and arthritis. (Id. ¶ 97). Sutton was assessed for degenerative joint disease and osteoarthritis. (Id.) CRNP Iannuzzi educated Sutton on Naprosyn and instructed him to purchase it from the commissary in the future. (Id.)

On February 8, 2018, Dr. Pandya renewed Sutton's Allopurinol and Naproxen medications. (Id. ¶ 98).

On February 29, 2018, CRNP Iannuzzi treated Sutton for contact dermatitis on his hand and ordered a topical medication. (Id. ¶ 99). On March 15, 2018, Sutton presented to CRNP Iannuzzi with complaints of still having the rash on his left hand. (Id. ¶ 100). CRNP Iannuzzi noted that Sutton continued to use harsh cleaners in his cell, despite being ordered to avoid the cleaners. (Id.)

On March 22, 2018, Sutton reviewed his paper and electronic medical records. (Id. ¶ 101).

On March 26, 2018, Dr. Pandya treated Sutton for eczema, prescribed a cream, and instructed him to return for a follow-up in two (2) weeks. (Id. ¶ 102).

On March 28, 2018, Sutton's nails were clipped. (Id. ¶ 103).

On April 10, 2018, Dr. Pandya examined Sutton's hand and noted that it was almost improved. (Id. ¶ 104). Dr. Pandya advised Sutton to continue using the cream and to cover his other hand while sleeping. (Id.)

On April 24, 2018, Sutton presented to the treatment line and requested to see a doctor.  (Id. ¶ 105).  Sutton was not in any acute distress and was educated on the sick call process and was encouraged to follow policy.  (Id.)  In response, Sutton "threatened litigation."  (Id.)

On April 30, 2018, Sutton presented to Dr. Pandya with complaints of new spots on his legs and complaints that the rash on his hand was still present.  (Id. ¶ 106).  Sutton inquired as to whether Hepatitis C was the cause of his outbreaks. (Id.)  Dr. Pandya noted that the lesion on Sutton's hand did not improve and noted new lesions on his legs.  (Id.)  Dr. Pandya diagnosed Sutton with eczema, prescribed ointment, and ordered a follow-up visit in one month.  (Id.)

On May 10, 2018, Dr. Pandya treated Sutton at the Hepatitis C Chronic Clinic. (Id. ¶ 107).  It was estimated that Sutton contracted liver disease between the 1970s and 1980s, it was noted that he was not previously hospitalized for liver disease, received no previous treatment for Hepatitis C, and had no history of cirrhosis.  (Id.) Sutton's diagnostic results were recorded as follows: APRI: 0.520, Platelet count of 192k, HCV genotype: na, HCV viral load: 5,175,830, AST:40, ALT: 26, Albumin: 4.3, Creatinine: 0.92, Elastography: no, and Fibrosure: n/a.  (Id.)  It was also noted that Sutton recently underwent an electrocardiogram ("ECG").  (Id.)  Dr. Pandya noted eczema on Sutton's left hand.  (Id.)  An examination revealed a normal general appearance, clear lungs, no abdominal pain, and no neurologic asterixis ("liver flop"").  (Id.)  Sutton's liver disease diagnosis was F0-F2 or APRI of less than 1.5, his liver disease control was determined to be good (F0-F2 or APRI<1.5), and his liver

disease status remained unchanged.  (Id.)  Sutton was educated on disease process, diet and nutrition, medication compliance, exercise, foot care, and symptom management, and was instructed to return to chronic care clinic in six (6) months. (Id.)  Dr. Pandya also noted that the Allopurinol prescription may have been triggering Sutton's skin reaction and planned to stop the prescription for four (4) to eight (8) weeks.  (Id.)  Dr. Pandya also educated Sutton on the importance of buying larger athletic shoes and planned to give him a slightly larger pair of diabetes mellitus shoes.  (Id.)

After Sutton's May 10, 2018 Hepatitis C Chronic Care Clinic appointment, Dr. Pandya ordered Sutton a hypertension panel and a uric acid clinical test for August 2018 Hepatitis C Chronic Care Clinic.  (Id. ¶ 108).  Dr. Pandya also ordered a high blood pressure examination.  (Id.)  He referred Sutton to the Custom Shoes Clinic for durable medical equipment.  (Id. ¶ 109).

On May 12, 2018, Sutton presented to the treatment line and provided his developed stool card which showed that his stool was negative for blood.  (Id. ¶ 110).

On June 6, 2018, Sutton presented to the foot clinic for an examination of his feet and to have his toenails clipped.  (Id. ¶ 111).  It was noted that Sutton had thick nails, but no appreciable disease.  (Id.)

On October 8, 2018, CRNP Iannuzzi treated Sutton in the foot clinic to have his feet examined and toenails clipped.  (Id. ¶ 112).  Also on October 8, 2018, Dr. Pandya ordered comprehensive and lipid panels and CBC and prothrombin time

clinical tests to be drawn for his Hepatitis C Chronic Care Clinic in March 2019.  (Id. ¶ 113).

On December 18, 2018, when housed at SCI-Dallas, Sutton was treated by Dr. Donald DeSantis in chronic care clinic for liver disease and general medicine.  (Id. ¶ 114).  Sutton's general medicine diagnosis was listed as Hepatitis C, gout, and plantar fasciitis.  (Id.)  With respect to Sutton's HCV, it was noted that he was diagnosed with the virus in 2005, had no history of hospitalizations for this disease prior to his incarceration, and no history of previous treatments.  (Id.)  His diagnostic results were recorded as follows: APRI score: .363; platelet count: 193 TH/CUMM; HCV RNA, Quant 0 3,675 487 IU/ML; AST/ALT: SCOT/AST-28 U/L; Albumin: 4.5 G/DL; Creatinine, Serum: 1.12 MG/DL; Fibrosure: n/a; and General Medicine Diagnostics: lipids, CMP liver profile+.  (Id.)  Dr. DeSantis' examination of Sutton yielded normal results.  (Id.)  Sutton's liver disease diagnosis and control were at stage F0-F2 or APRI<l. 5 and his liver disease status was unchanged.  (Id.)  Sutton's fasciitis and gout were determined to be good and unchanged.  (Id.)  Dr. DeSantis ordered an orthotics consult, an increased dose of Naprosyn, a sonogram of Sutton's abdomen to check for cirrhosis, and to receive the flu and pneumococcal vaccines.  (Id.)  Dr. DeSantis also scheduled a return to the Hepatitis C Chronic Care Clinic in six (6) months for his annual panels and clinical tests.  (Id.)  Additionally, he ordered a liver (hepatic) function panel to be drawn for Sutton's next Hepatitis C Chronic Care Clinic and noted that he would reevaluate Sutton on December 12, 2018.  (Id.)

On January 30, 2019, Dr. Mary-Joy Monsalud treated Sutton for complaints of left heel pain and stiffness of both of his feet, and to discuss physical therapy recommendations for his feet. (Id. ¶ 117). An examination revealed that Sutton had flat feet and a valgus deformity of his right great toe metatarsophalangeal. (Id.) Dr. Monsalud recommended a podiatry consult. (Id.)

On February 28, 2019 and March 4, 2019, Sutton was a no show for a sick call. (Id. ¶¶ 118-119).

On March 20, 2019, Sutton presented to the foot clinic to have his feet examined and his toenails clipped. (Id. ¶ 120). Assessment of his feet revealed that he had hyperkeratotic nails. (Id.) CRNP Iannuzzi educated Sutton on his condition and provided foot care. (Id.)

On April 3, 2019, Sutton was a no show for a sick call. (Id. ¶ 121).

On April 12, 2019, Sutton presented to Dr. Monsalud for a follow-up on his podiatry consult. (Id. ¶ 122). Sutton reported that he received injections in the back and bottom of his heels, was given an Air Cast heel splint, and prescribed exercise. (Id.) Upon examination, it was determined that he was wearing his heel splint and ambulating without difficulty. (Id.) Dr. Monsalud explained that the podiatrist ordered him a thick-heeled shoe with a wedge insert, and she assured him that the shoes would be ordered. (Id.) She also demonstrated exercises and instructed Sutton to follow-up on an as needed basis. (Id.)

On April 17, 2019, Sutton was a no show for sick call. (Id. ¶ 123).

On April 26, 2019, Sutton presented to a physician's assistant with complaints that he smoked one-half pack of cigarettes per day for the past forty (40) years and wished to quit smoking.  (Id. ¶ 124).

On May 17, 2019, Sutton received an annual tuberculosis test.  (Id. ¶ 125).

On June 6, 2019, Sutton presented to Chronic Care Clinic for liver disease. (Id. ¶ 126).  It was again noted that Sutton contracted the disease in 2007, he was never hospitalized for liver disease, he had a history of tattoos, no history of treatment for Hepatitis C, and no history of cirrhosis.  (Id.)  Sutton reported that he experienced abdominal pain and fatigue daily.  (Id.)  His lab and clinical test results showed that he had an APRI score of .2433, a platelet count of 237, no HCV genotype, a HCV viral load of 3,675,487, an AST level of 23, an ALT level of 14, an albumin level of 4.5, and a creatinine level of 1.09.  (Id.)  Sutton's liver disease diagnosis was F0-F2 or APRI of less than 1.5, his liver disease control was determined to be good (F0-F2 or APRI<1.5); and his liver disease status remained unchanged.  (Id.)  The plan was to educate Sutton on the disease process, diet and nutrition, exercise, and symptom management.  (Id.)  Dr. Monsalud also requested to check his blood pressure in five (5) weeks and ordered bloodwork.  (Id. ¶¶ 126-127).

On June 24, 2019, Sutton was a no show for a sick call.  (Id. ¶ 128).

On June 26, 2019, Sutton was issued a pair of sneakers and arch supports, and a pair of metatarsal bars to assist with his foot pain.  (Id. ¶ 129).

On June 28, 2019, Sutton presented to CRNP Iannuzzi with complaints of intermittent pain in his foot for four (4) to five (5) months.  (Id. ¶ 130).  Upon assessment, it was determined that Sutton was obese and had degenerative joint disease and plantar fasciitis that was well managed with medicine.  (Id.)  It was determined that Sutton's plantar fasciitis would be treated with non-steroidal anti-inflammatory drugs, and he would follow-up with the foot clinic.  (Id.)  On July 16, 2019, a physician's assistant treated Sutton in the foot clinic for long mitotic toenails.  (Id. ¶ 131).

On September 27, 2019, a physician's assistant treated Sutton for chronic left foot and ankle pain and hand dermatitis.  (Id. ¶ 132).  The physician's assistant ordered padded insoles and a cream.  (Id.)

On November 8, 2019, Sutton was treated for an ongoing headache after being punched in the head in October of 2019.  (Id. ¶ 133).  He was examined and instructed to return on an as needed basis or if his symptoms increased and was added to Chronic Clinic for his hypertension.  (Id.)

On November 12, 2019, Sutton was a no show for a medical appointment.  (Id. ¶ 134).

On November 20, 2019, it was noted that Sutton was unable to attend his November 20, 2019 Chronic Care appointment.  (Id. ¶ 135).

On November 27, 2019, Sutton presented to his Hypertension and Liver Disease Chronic Care Clinics.  (Id. ¶ 136).  The following information was noted: APRI: 0.321; platelet count: 192; HCV viral load: 33,675,487 IU/ML; AST: 28; ALT: 22

albumin: 4.1; and creatinine: 1.18.  (Id.)  Dr. Monsalud scheduled Sutton for a
Hepatitis C lab panel for his April 2020 Chronic Care Clinic visit.  (Id.)

On December 17, 2019, Sutton failed to present to the foot clinic for an
examination and care.  (Id. ¶ 137).

On January 13, 2020, Sutton was assessed for interval improvement of his
plantar fasciitis and a mild knee strain.  (Id. ¶ 138).  Sutton was advised to rest, use
an ice pack on an as needed basis, and place a sick call or use triage if the symptoms
got worse.  (Id.)

On January 16, 2020, Sutton presented to the foot clinic to have his toenails
clipped.  (Id. ¶ 139).

On February 7, 2020, Sutton was treated for complaints of intermittent knee
pain for more than five (5) years that was better controlled when he had an orthotic
sole.  (Id. ¶ 140).  He also reported that he mostly experiences pain with running and
is fine when walking.  (Id.)  It was noted that Sutton was overweight, had
degenerative joint disease, and an ankle sprain/strain.  (Id.)  He was advised to
stretch and return for follow-up care.  (Id.)

On February 17, 2020, Dr. Monsalud treated Sutton for complaints that his
hard arch supports and ankle supports were taken away.  (Id. ¶ 141).  Dr. Monsalud
noted that Sutton had plantar fasciitis, severe bunions, valgus deformity/laxity of
his left ankle, and flat feet.  (Id.)  Dr. Monsalud gave Sutton ankle support,
metatarsal pads, and a hard heel cup with a foam overlay for a period of six (6)

25

months.  (Id.)  Dr. Monsalud also scheduled Sutton for a routine test of his right knee.  (Id.)

On February 18, 2020, CRNP Iannuzzi assessed Sutton for plantar fasciitis, possible tendinitis, and complex musculoskeletal foot complaints for more than ten (10) years.  (Id. ¶ 142).  Sutton complained that he was unable to use his right plantar pad because it was not helping his symptoms and that he needed a pad for each shoe so that he could walk normally.  (Id.)  CRNP Iannuzzi cut the pads into two and Sutton reported that this temporary solution helped alleviate his symptoms.  (Id.)

On February 25, 2020, Sutton was assessed for mild to moderate pain in his right knee and underwent an X-ray of his right knee.  (Id. ¶ 143).

On March 12, 2020, Dr. Monsalud met with Sutton to discuss starting treatment for his Hepatitis C infection.  (Id. ¶ 144).  Sutton reported that he had occasional abdominal pain.  (Id.).  Dr. Monsalud informed Sutton that his pain would resolve if his HCV was causing it.  (Id.)  She also informed Sutton that the PUGH score and Fibrosure tests are no longer used because they are now treating everyone with any viral load.  (Id.)  Dr. Monsalud prescribed Zepatier, informed him of the side effects of the medication, and emphasized the need for 100% compliance to prevent development of resistance.  (Id.)

On March 26, 2020, CRNP Iannuzzi met Sutton at his cell to treat him for a sick call.  (Id. ¶ 145).  However, Sutton denied placing a sick call, reported that he received his capsaicin, he was asymptomatic, and he continues to eat and stay well

hydrated.  (Id.)  CRNP Iannuzzi noted that Sutton did not appear to be in acute distress, his medication for his musculoskeletal complaints was well managed, and he was asymptomatic at the time of the visit.  (Id.)

On May 19, 2020, Sutton requested renewal of his capsicum cream, which was renewed.  (Id. ¶ 146).

On June 26, 2020, Sutton requested his arthritis medication.  (Id. ¶ 147).  CRNP Iannuzzi assessed mild degenerative joint disease, instructed Sutton to do stretches, and return to for follow-up care.  (Id.)

On June 29, 2020, Sutton was approved for an inter-system transfer for COVID-19 testing.  (Id. ¶ 148).

On July 15, 2020, Sutton presented to CRNP DeBoer for sick call with complained of pain in his abdomen since arriving at SCI-Dallas.  (Id. ¶ 149).  Sutton reported that he was prescribed Hepatitis C treatment on March 16, 2020, and that he was getting a GERD diet.  (Id.)  Sutton admitted that he purchased food from the commissary that was not consistent with the special GERD diet.  (Id.)  Nurse De Boer informed Sutton that she would resubmit a consult to be remeasured for shoes and instructed him to return for care on an as needed basis.  (Id.)

On August 3, 2020, a physician's assistant treated Sutton for complaints of chronic pain in his legs, feet, and ankles.  (Id. ¶ 150).  It was noted that Sutton had a valgus deformity of the left ankle which was causing his leg pain.  (Id.)  It was also noted that a new orthotic was ordered, but he had not received it.  (Id.)  A new

medication was prescribed, and Sutton was instructed to return for follow-up care. (Id.)

On August 21, 2020, Sutton was treated by CRNP DeBoer for complaints of a sore foot, sore ankle, and sore bilateral knees.  (Id. ¶ 151).  Sutton also reported that he was taking Mobic with no relief.  (Id.)  CRNP DeBoer ordered X-rays of Sutton's bilateral knees and instructed him to return for care on an as needed basis.  (Id.)

On August 27, 2020, Sutton was seen for sick call by CRNP DeBoer, requesting a GERD diet.  (Id. ¶ 155).  Sutton denied purchasing commissary items that were not consistent with his GERD diet.  (Id.)  CRNP DeBoer noted the results of his knee X-rays showed advanced osteoarthritis in the right knee with spurring. (Id.)  She arranged for Sutton to receive a right knee open brace, put in a consult for physical therapy, submitted a request for a GERD diet for six (6) months, and suggested that Sutton sign up for sick call the following week, and follow-up on an as needed basis.  (Id.)

After Sutton completed the course of Zepatier, laboratory studies were drawn on September 1, 2020, which revealed no detectable Hepatitis C virus in his system.  (Id. ¶ 153).  Sutton was effectively cured of the Hepatitis C virus.  (Id.)

On September 9, 2020, Sutton was seen for sick call by a physician's assistant and reported that he was waiting to be seen by the foot clinic and podiatry.  (Id. ¶ 154).  The physician's assistant advised Sutton that the consult was approved for podiatry, the foot clinics for nail trimming were suspended due to COVID-19

precautions, and the Health Services Administrator was trying to schedule an appointment with podiatry, but the pandemic was complicating scheduling.  (Id.)

On September 14, 2020, Dr. Scott Prince reviewed Sutton's physical therapy consultation.  (Id. ¶ 155).  Dr. Prince recommended that Sutton be provided a brace and noted that Sutton requested arthritis gel for relief.  (Id.)

On September 15, 2020, Sutton was seen by CRNP DeBoer for sick call, inquiring about a knee brace, GERD diet, and requesting a toenail trim.  (Id. ¶ 156).  CRNP DeBoer ordered an open left knee sleeve and prescribed capsaicin, and updated Sutton's restrictions.  (Id.)

On September 24, 2020, Sutton was a no show for sick call.  (Id. ¶ 157).  On September 25, 2020, Sutton presented to the infirmary with complaints of chronic, sharp, and constant sciatica back pain in his lower back right leg.  (Id. ¶ 158).  An examination of his back revealed that he had an impaired range of motion and a presence of pedal pulses.  (Id.)  Sutton was referred for sick call and was treated by a physician's assistant on September 25, 2020.  (Id. ¶¶ 158-159).  Sutton reported that he woke up with mild, constant pain in his right buttock region radiating down his right leg two (2) days prior.  (Id. ¶ 159).  He requested a medical diet card for his approved GERD diet.  (Id.)  It was recommended that Sutton rest, stretch, receive a Robaxin and Medrol dose pack, continue Mobic, and he was given a diet card until March 13, 2021.  (Id.)

On October 2, 2020, Dr. Bora Sakia treated Sutton for pain in his lower back and knee.  (Id. ¶ 160).  Sutton reported that he had lumbar spine surgery more than

ten (10) years ago.  (Id.)  It was noted that Sutton's knee pain improved with Medrol and that he was seen by the physical therapist.  (Id.)  Sutton's Mobic was increased, he was to be seen by a physical therapist, undergo a new X-ray of his spine, and be provided topical pain cream.  (Id.)  It was also noted that his amlodipine and Chlorthalidone would be discontinued, he was to start taking dydrochlorothiazide with a potassium supplement, and he was to receive a Medrol pack.  (Id.)

On October 6, 2020, Sutton presented to Dr. Sakia regarding questions about his blood pressure medications and to report that his blood pressure is stable without medication, and that he had not taken his hydrochlorothiazide and supplements.  (Id. ¶ 161).  Dr. Sakia discontinued his amlodipine, ordered his blood pressure to be checked on a weekly basis, and instructed him to return on an as needed basis.  (Id.)

On October 22, 2020, Sutton was seen on sick call with complaints that his capsaicin cream and Mobic were not helping his knee pain.  (Id. ¶ 162).  Sutton was assessed for knee pain.  (Id.)  The physician's assistant indicated that she would request renewal of Voltaren, that Sutton would receive orthotic inserts with shoes on October 23, 2020, and he should return on an as needed basis.  (Id.)

On November 18, 2020, Sutton was tested FOR COVID-19 after exhibiting symptoms.  (Id. ¶ 163).  He was subsequently admitted to the infirmary and remained there until his recovery on December 3, 2020.  (Id.)

On December 17, 2020, a physician's assistant referred Sutton to the Eye Clinic for an examination.  (Id. ¶ 164).

30

On January 13, 2021, Dr. Sakia treated Sutton and determined that he had bilateral plantar aspect of the feet, his hands were excessively dry, and detected no open sores. (Id. ¶ 165). Dr. Sakia renewed Sutton's Vitamin E and instructed him to apply zinc ointment if sores are detected. (Id.) On January 15, 2021, Dr. Sakia ordered Capsaicin cream. (Id. ¶ 166).

On January 21, 2021, a physician's assistant assessed Sutton for osteoarthritis of the bilateral knees. (Id. ¶ 167). The physician's assistant renewed Sutton's Diclofenac gel and Mobic, instructed him to continue resting and stretching, and to return to care on an as needed basis. (Id.)

On February 24, 2021, Sutton was treated on sick call. (Id. ¶ 168). CRNP De Boer requested renewal of Sutton's previously approved GERD diet, renewed his Mobic prescription, prescribed Zinc Oxide, requested a professional opinion on care for his feet, and instructed Sutton to follow-up at the foot clinic. (Id.)

On March 2, 2021, Dr. Sakia evaluated Sutton at the Hypertension and Cardiac and Liver Disease Chronic Care Clinics. (Id. ¶ 169). With respect to Sutton's Hepatitis C, it was noted that he contracted liver disease in 2007, was previously treated with Zepatier in 2020, and had no history cirrhosis or symptoms of Hepatitis C. (Id.) Sutton's prior lab results showed that he was positive for Hepatitis B antibodies and had an APRI score of 0.217, a platelet count of 196 TH/CUMM, an undetected HCV RNA, QUANT viral load, SGOT/AST was 17 U/L, SGPT/ALT was 8 U/L, albumin count was 4.7 G/DL, and creatinine count of 1.24 MG/DL. (Id.) Sutton's liver disease diagnosis was F0-F2 or APRI<1.5, liver disease

control was "good" (F0-F2 or APRI<1.5), and his liver disease status remained unchanged.  (Id.)  He was scheduled to return to the chronic clinics in six (6) months and was scheduled to have his annual comprehensive and lipid panels and clinical tests performed in April of 2021.  (Id.)

On March 3, 2021, Sutton underwent an eye examination.  (Id. ¶ 170).  On March 5, 2021, Dr. Prince approved Sutton for a urinalysis.  (Id. ¶ 171).  On March 8, 2021, a pair of eyeglasses were ordered for Sutton.  (Id. ¶ 172).

On March 10, 2021, Sutton was seen for unimproved dry skin rashes on his feet and ankles.  (Id. ¶ 173).  A physician's assistant issued him a trial of Cetaphil lotion and instructed him to for follow-up care.  (Id.)

On March 29, 2021, Sutton was seen by a physician's assistant on sick call for complaints of pain in his feet and toenails.  (Id. ¶ 174).  The physician's assistant noted that Sutton did not have any open wounds and was not diabetic, trimmed his nails, scheduled him to follow-up with Hypertension Chronic Clinic, ordered that he receive blood pressure checks every two (2) weeks, and return to care if his blood pressure is 140/90.  (Id.)

On April 1, 2021, Sutton underwent X-rays of his left foot and ankle which revealed no radiographic evidence of an acute fracture.  (Id. ¶ 175).

On April 27, 2021, Dr. Sakia spoke with Sutton regarding his slightly worse renal function and preventative care.  (Id. ¶ 176).

On May 4, 2021, Sutton received the COVID-19 vaccine.  (Id. ¶ 177).

On May 5, 2021, CRNP DeBoer examined Sutton and determined that he had eczema on both feet. (Id. ¶ 178). She prescribed Triamcinolone ointment, renewed the Cetaphil lotion, advised Sutton that Zinc Oxide generally does not cause skin burns, and advised him that his knee pain may be due to arthritis rather than the braces. (Id.) Sutton was placed on lower bunk status due to wearing knee braces for chronic pain, and was placed on several activity and employment restrictions. (Id. ¶ 179).

On May 12, 2021, Sutton was issued extra-large bilateral knee sleeves with two (2) lateral straps, eyeglasses, and partial upper dentures. (Id. ¶ 180). CRNP DeBoer examined Sutton and informed him that his August 2020 X-rays of his bilateral knees showed moderate-to-severe narrowing in his right knee and narrowing in his left knee and referred him to Dr. Prince for a possible knee injection. (Id.) His labs indicated that his Creatinine, Serum count was 1.41 MG/DL. (Id.)

On May 24, 2021, Sutton placed a sick call with complaints of bilateral knee pain, including "extreme pain" when moving, despite his use of a gel. (Id. ¶ 181). CRNP DeBoer noted that Sutton was already aware of the results of his August 2020 bilateral knee X-rays and instructed him to follow up with Dr. Prince and on an as needed basis. (Id.)

On June 11, 2021, Dr. Prince administered a Kenalog 40 injection to Sutton's right knee and instructed him to follow-up on a left knee injection on the MD Line during the week of July 12, 2021. (Id. ¶ 182).

33

On June 16, 2021, a physician's assistant scheduled Sutton for a routine left foot and ankle X-ray. (Id. ¶ 183). The physician's assistant examined Sutton and found that he was limping due to pain. (Id. ¶ 184). She discontinued his Mobic, began Tylenol and a topical cream, continued the use of orthotics and instructed him to return on an as needed basis. (Id.)

On June 18, 2021, Sutton was placed on the roster for medical showers. (Id. ¶ 185).

On June 25, 2021, a physician's assistant ordered that Sutton continue to use his orthotics and planned to refer him to the MD Line to determine if further management was necessary. (Id. ¶ 186).

On July 8, 2021, Dr. Scott treated Sutton and agreed to administer an Kenalog 40 injection in his left knee, he continued Sutton's acetaminophen, Voltaren gel, and capsaicin, and advised Sutton that there were not many other treatment options for his degenerative joint disease. (Id. ¶ 187).

On July 12, 2021, Dr. Sakia evaluated Sutton. (Id. ¶ 188). With respect to his Hepatitis C, Sutton's prior lab results revealed that his APRI score was 0.217, platelet count was 211 TH/CUM, Albumin was 4.5, and his HCV genotype was IA. (Id.) It was also noted that his September 8, 2020 lab results reveled that his HCV viral load was not detected. (Id.) Sutton's liver disease diagnosis was F0-F2 or APRI<1.5, his liver disease control was determined to be "fair," which was F3 or APRI 1.5-2.0, and his liver disease status remained unchanged. (Id.) Sutton was directed to return to his chronic care clinics in six (6) months and have his annual

lipid panel and prothrombin time clinic tests taken in October of 2021.  (Id.)  Also on July 12, 2021, a physician's assistant requested an onsite telemedicine physical therapy consultation for evaluation of Sutton's need for a left ankle brace.  (Id. ¶ 189).

On July 19, 2021, a physician's assistant treated Sutton for complaints of pain in his left ankle and request for a nail trim at the foot clinic. (Id. ¶ 187).  The physician's assistant referred Sutton to the foot clinic and physical therapy for further evaluation.  (Id.)

On July 28, 2021, a physician's assistant treated Sutton and checked his vitals, which revealed that his blood pressure was 160/100.  (Id. ¶ 191).  The physician's assistant indicated that Sutton should began taking Lisinopril/HCTZ, his no weightlifting restriction was discontinued, he was restricted from lifting more than twenty-five (25) pounds, and informed him that he was scheduled for the foot clinic.  (Id.)

On July 28, 2021, Sutton had a tuberculosis treatment review.  (Id. ¶ 192).

In the instant complaint, Sutton alleges that defendant Pandya violated his Eighth Amendment rights by failing to treat his Hepatitis C for several years, and that defendant Pandya was negligent for failing to provide adequate treatment for his Hepatitis C.  (Doc. 1).  Defendant Pandya moves for summary judgment.  (Doc.

63).  Sutton failed to respond to the motion and the time for responding has now

passed.[4]  Therefore, the motion is deemed unopposed and ripe for resolution.

## II.    **Legal Standard**

Through summary adjudication, the court may dispose of those claims that

do not present a "genuine dispute as to any material fact" and for which a jury trial

would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of

proof tasks the non-moving party to come forth with "affirmative evidence, beyond

the allegations of the pleadings," in support of its right to relief.  Pappas v. City of

Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett,

477 U.S. 317, 322-23 (1986).  The court is to view the evidence "in the light most

favorable to the non-moving party and draw all reasonable inferences in that party's

favor."  Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014).  This

evidence must be adequate, as a matter of law, to sustain a judgment in favor of the

non-moving party on the claims.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-

57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89

(1986).  Only if this threshold is met may the cause of action proceed.  See Pappas,

331 F. Supp. 2d at 315.

---

[4]  Sutton was directed to file a brief in opposition to defendant Pandya's
motion and was admonished that failure to file an opposition brief would result in
defendant Pandya's motion being deemed unopposed.  (Doc. 69) (citing M.D. PA.
LOCAL RULE OF COURT 7.6).  (See also Doc. 3, Standing Practice Order in Pro Se
Plaintiff Cases, at 2).

### III.    Discussion

In his motion for summary judgment, defendant Pandya argues that the record lacks evidence showing that his actions rose to the level of an Eighth Amendment violation, and the evidence confirms that Sutton failed to file a certificate of merit for his medical malpractice claim.  (Doc. 63).  We will address each argument in turn.

####    A.    Constitutional Claim

For the delay or denial of medical care to rise to an Eighth Amendment violation, a prisoner must demonstrate: "(1) that defendants were deliberately indifferent to [his] medical needs and (2) that those needs were serious."  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).  Deliberate indifference requires proof that the official "knows of and disregards an excessive risk to inmate health or safety." Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).  Deliberate indifference has been found where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a nonmedical reason; or (3) prevents a prisoner from receiving needed or recommended treatment."  Rouse, 182 F.3d at 197.  Deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment. . . (which) remains a question of sound professional judgment."  Inmates of Allegheny Cnty. Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (quoting Bowring v.

Godwin, 551 F.2d 44, 48 (4th Cir. 1977)). "Allegations of medical malpractice are not sufficient to establish a Constitutional violation," nor is "[m]ere disagreement as to the proper medical treatment." Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004). A "failure to provide adequate care . . . [that] was deliberate, and motivated by non-medical factors" is actionable under the Eighth Amendment, but "inadequate care [that] was a result of an error in medical judgment" is not. Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993); see also Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

There is no dispute that Sutton's Hepatitis C qualifies as a serious medical condition for purposes of the Eighth Amendment analysis. Moore v. Luffey, 767 F. App'x 335, 340 (3d Cir. 2019) (nonprecedential) (recognizing Hepatitis C constitutes a serious medical need). In failing to oppose defendant Pandya's motion, Sutton has not advanced any evidence to permit the trier of fact to determine that defendant Pandya acted with deliberate indifference to his serious medical needs.

While Sutton asserts that defendant Pandya failed to provide medical care for his Hepatitis C, the record is replete with evidence that he received continual medical care for this condition. The uncontroverted record evidence establishes that Sutton was stable, was being monitored and treated, received blood tests and liver screenings—which indicated that his liver was in good condition, and he was ultimately cured. (Docs. 65-1, 65-2, 65-3). Specifically, the record before the court evinces that from May 2017 through November 2019, Sutton had low APRI scores— ranging from 0.217 to 0.520—and was not a candidate for treatment with DAADs under the DOC's Protocols for treating Hepatitis C. (Doc. 64 ¶¶ 84, 92, 107, 114, 126,

136, 169).  During this time when Sutton's condition did not warrant treatment with DAADs, he received medical care through the chronic care clinic which included monitoring, periodic examination, testing, and review of blood test results.  (Id. ¶¶ 84, 85, 92, 93, 107, 114, 126, 136).  Beginning in March 2020, Sutton was approved for treatment with DAADs and was treated with Zepatier.  (Id. ¶ 144; Doc. 65-1 at 102-03).  Sutton's condition never progressed to cirrhosis.  (Doc. 64 ¶¶ 85, 107, 126, 169).  Labwork from September 2020 revealed that HCV was not detected, indicating that Sutton has been cured.  (Id. ¶ 188; Doc. 65-3 at 158-59).  On these unconverted facts, no reasonable jury could conclude that defendant Pandya failed to provide medical care and treatment for Sutton's Hepatitis C.

Sutton's primary complaint is that his treatment should have begun earlier, based on a declaration from the AASLD that treatment with DAADS is recommended for all patients with chronic Hepatitis C irrespective of disease stage.  (Doc. 1 at 15, 18-19).  This argument implies Sutton's disagreement with a particular course of treatment and his own lay opinion regarding the proper course of treatment for his hepatitis C infection.  However, mere disagreement with the selected course of treatment is not grounds for a medical deliberate indifference claim.  See Thomas v. Dragovich, 142 F. App'x 33, 36 (3d Cir. 2005) (nonprecedential) (citing Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987)).  To the extent that Sutton asserts that defendant Pandya's professional judgment was deficient, this also is not enough to rise to the level of a constitutional violation, and courts will not second guess whether a

39

particular course of treatment is adequate or proper.  See Parham v. Johnson, 126

F.3d 454, 458 n.7 (3d Cir. 1997) (citing Inmates of Allegheny Cnty. Jail, 612 F.2d at

762).

Sutton further asserts that the delay in treatment caused eczema, depression,

fatigue, and abdominal pain.  (Doc. 1 at 21).  Beginning in October 2017, Sutton

developed a skin rash on his hand.  (Doc. 64 ¶¶ 89, 99, 100, 106, 107, 132).  In May

2018, defendant Pandya treated Sutton in the chronic care clinic and noted that the

skin rash was likely caused by his gout medication.  (Id. ¶ 107).  Additional

documentation provides that Sutton's contact dermatitis was caused by an irritant.

(Id. ¶ 100).  In June 2019 and November 2019, Sutton presented to the chronic care

clinic with reports of abdominal pain and fatigue, which could be symptoms of liver

disease.  (Id. ¶¶ 126, 136).  Upon assessment, Sutton's liver disease control was

determined to be adequately controlled (F0-F2 or APRI of less than 1.5), his liver

disease status remained unchanged, and he had no abdominal pain on examination.

(Id.)  Thereafter, in March 2020, Sutton began treatment with Zepatier, which was

completed by June 2020.  (Id. ¶ 144).  Once this treatment regimen was completed,

laboratory studies conducted in September 2020 revealed no detectable Hepatitis C

virus in his system.  (Id. ¶ 153).  Sutton has not adduced any evidence that his

treatment was delayed for nonmedical reasons or that he suffers from long-term

ailments as a result of any delayed treatment for his Hepatitis C.  See Altenbach v.

Ianuzzi, 646 F. App'x 147, 152 (3d Cir. 2016) (nonprecedential) (requiring inmate to

submit "'verif[ied] medical evidence . . . to establish the detrimental effect of [the]

delay' [in medical treatment] as he must do to support a delayed treatment claim")
(citing Hill v. Dekalb Rg'l Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994)).
In fact, the undisputed evidence confirms that Sutton received extensive medical
treatment which has successfully cured him of his Hepatitis C virus.

The party adverse to summary judgment must raise "more than a mere
scintilla of evidence in its favor" in order to overcome a summary judgment motion
and cannot survive by relying on unsupported assertions, conclusory allegations, or
mere suspicions. Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d
Cir. 1989). Sutton has wholly failed to meet this burden in that he neglected to
oppose defendant Pandya's motion for summary judgment. Despite his failure to
oppose the motion, it is clear on the record that Sutton's medical treatment
commenced immediately upon entering SCI-Frackville, he received various forms
of treatment for his Hepatitis C, and he was carefully monitored by prison medical
staff. Our Court of Appeals has upheld the constitutionality of medical choices
relating to the care and treatment of Hepatitis C, and it has rejected inmate Eighth
Amendment challenges to this type of medical care. See, e.g., Moore, 767 F. App'x
335 (affirming summary judgment on inmate's Eighth Amendment claim relating to
treatment of Hepatitis C and finding doctor appropriately monitored and treated
inmate in accordance with policy); Lasko v. Watts, 373 F. App'x 196, 203 (3d Cir.
2010) (nonprecedential) (affirming summary judgment on inmate's Eighth
Amendment claim relating to treatment of Hepatitis C); Hodge v. U.S. Dep't of

Justice, 372 F. App'x 264 (3d Cir. 2010) (nonprecedential) (same).  Accordingly, summary judgment in favor of defendant Pandya is appropriate.

### B.    Medical Malpractice Claim

In Pennsylvania, medical negligence, or medical malpractice, is defined as "the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." Toogood v. Owen J. Rogal, D.D.S., P.C., 824 A.2d 1140, 1145 (Pa. 2003) (citing Hodgson v. Bigelow, 7 A.2d 338 (Pa. 1939)).  The existence of an injury, by itself, does not prove a doctor's negligence. Mitchell v. Shikora, 209 A.3d 307, 315 (Pa. 2019) (citations omitted).  Rather, to establish a cause of action for negligence under Pennsylvania law, a plaintiff must prove the following elements: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages.  See Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 139 (3d Cir. 2005) (citing In re TMI, 67 F.3d 1103, 1117 (3d Cir. 1995)).

Pennsylvania Rule of Civil Procedure 1042.3 requires a plaintiff alleging professional negligence to file a certificate of merit within 60 days of filing the complaint.  PA. R. CIV. P. 1042.3.  The certificate must include one of the following: a written attestation by "an appropriate licensed professional" that there is a "reasonable probability that the care, skill or knowledge exercised or exhibited" by the defendant "fell outside acceptable professional standards," and that this was the cause of the plaintiff's injuries; a statement that the claim against the defendant is

based only on the professional negligence of those for whom the defendant is responsible; or a statement that expert testimony is unnecessary for the plaintiff's claim to proceed.  PA. R. CIV. P. 1042.3(a)(1)-(3).  Failure to file a certificate of merit is fatal to a plaintiff's claim.  PA. R. CIV. P. 1042.7.  The requirements of Rule 1042.3 are substantive in nature and, therefore, federal courts in Pennsylvania must apply these prerequisites of Pennsylvania law when assessing the merits of a medical malpractice claim.  See Liggon-Redding v. Estate of Sugarman, 659 F.3d 258, 262-65 (3d Cir. 2011); Iwanejko v. Cohen & Grigsby, P.C., 249 F. App'x 938, 944 (3d Cir. 2007).  This requirement applies with equal force to counseled complaints and to *pro se* medical malpractice actions brought under state law.  See Hodge v. Dep't of Justice, 372 F. App'x 264, 267 (3d Cir. 2010) (affirming district court's dismissal of medical negligence claim for failure to file a certificate of merit).

The Pennsylvania Supreme Court has noted that "[b]ecause the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons[,] a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury."  Toogood, 824 A.2d at 1145.  A very narrow exception applies "where the matter is so simple or the lack of skill or care is so obvious as to be within the range of experience and comprehension of even non-professional persons."  Hightower-Warren v. Silk, 698 A.2d 52, 54 n.1 (Pa. 1997).

Given the nature of Sutton's claim, he must present expert testimony to establish defendant Pandya's negligence in providing medical care for his Hepatitis C. Sutton's claim concerns complex issues relating to the standard of care and causation, which he simply cannot establish without expert testimony. See Toogood, 824 A.2d at 1151. This is not a case where a licensed medical professional's deviation from the standard of care and that deviation's causation of injury are obvious and within the realm of a layperson. See, e.g., Hakeem v. Salaam, 260 F. App'x 432, 435 (3d Cir. 2008) ("Absent expert opinion that the [defendant's] treatment deviated from acceptable medical standards, a reasonable fact-finder could not conclude that the [defendant] acted negligently.").

On February 15, 2021, counsel for defendant Pandya mailed Sutton a Notice of Intent to Dismiss Pursuant to Rule 1042.7. (See Doc. 65-4). On March 23, 2021, counsel for defendant Pandya mailed Sutton a second copy of the Notice of Intent to Dismiss Pursuant to Rule 1042.7. (See Doc. 65-5). Sutton's complaint was filed on December 2, 2019. On or before January 31, 2020, Sutton was required to file, in accordance with Pennsylvania Rule 1042.3, a certificate of merit producing expert testimony to opine that defendant Pandya deviated from the acceptable professional standard. The record reveals that a certificate of merit was not filed, and Sutton did seek an enlargement of time in which to do so. Nor did Sutton make a substantial effort to comply with the rule or provide a reasonable excuse for failing to do so.

Sutton's failure to file a certificate of merit is fatal to his medical negligence claim and defendant Pandya is entitled to judgment as a matter of law.

IV.  **Conclusion**

We will grant defendant Pandya's motion (Doc. 63) and enter judgment in his favor.  An appropriate order shall issue.


/S/ Christopher C. Conner
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania


Dated:       July 18, 2022